12-2371-cv
Ozaltin v. Ozaltin

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2012

(Argued: October 23, 2012                    Decided: February 11, 2013)

Docket No. 12-2371-cv

_____

NURETTIN OZALTIN,

*Petitioner-Appellee,*

v.

ZEYNEP TEKINER OZALTIN,

*Respondent-Appellant.*

_____

Before: LEVAL, CABRANES, and SACK, Circuit Judges.

In this suit under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11603(b), petitioner-appellee Nurettin Ozaltin ("the Father") sought and obtained an order in the United States District Court for the Southern District of New York (Laura Taylor Swain, *Judge*) requiring his estranged wife, respondent-appellant Zeynep Tekiner Ozaltin ("the Mother"), to return the couple's two children to Turkey. The Mother, who returned the children from New York to Turkey in July 2012 pursuant to the District Court's order, now appeals that order and contests the District Court's

1

award of necessary expenses to the Father. She also argues that the District Court improperly concluded that it had jurisdiction under ICARA to grant the Father visitation rights while the children were still in the United States.

We affirm the District Court's return order. The Father met his burden of showing that he retained custody rights under Turkish law, and that the Mother's removal of the children from Turkey interfered with his exercise of those rights. With regard to the visitation claim, we hold— contrary to the Fourth Circuit's decision in *Cantor v. Cohen*, 442 F.3d 196 (4th Cir. 2006)—that 42 U.S.C. § 11603(b) creates a federal right of action to enforce "access" rights protected under the Hague Convention.

Finally, we vacate the District Court's costs order and remand for further proceedings. When a district court considers whether to award "necessary expenses" to a prevailing petitioner under the Hague Convention, the court "shall" award necessary expenses incurred during the course of proceedings in the action unless doing so would be "clearly inappropriate." 42 U.S.C. § 11607(b)(3). This standard is discretionary in nature and is governed by general equitable principles. Given the circumstances of this case, we conclude that an award of all necessary expenses would be "clearly inappropriate." *Id.*

As noted above, the judgment of the District Court is affirmed in part and vacated in part, and the cause is remanded for further proceedings.

> BONNIE E. RABIN (Tim James, *Of Counsel*), Cohen Rabin Stine Schumann LLP, New York, NY, *for Petitioner-Appellee Nurettin Ozaltin.*
>
> ARUN S. SUBRAMANIAN (Jacob W. Buchdahl, William R.H. Merrill, *on the brief*), Susman Godfrey LLP, New York, NY, and Houston, TX, *for Respondent-Appellant Zeynep Tekiner Ozaltin.*

JOSÉ A. CABRANES, *Circuit Judge*:

Petitioner-appellee Nurettin Ozaltin ("the Father") brought this suit under the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11603(b),[1] seeking the return of his two minor children to Turkey, as well as an order enforcing his rights under Turkish law to visit the children as long as they stayed in the United States with their mother, respondent-appellant Zeynep Tekiner Ozaltin ("the Mother"). In December 2010, when the Ozaltins stopped cohabitating in Turkey, the Mother took the children to reside with her in New York City.[2] In an order dated June 5, 2012, the United States District Court for the Southern District of New York (Laura Taylor Swain, *Judge*) ordered that the Mother: (1) return the children to Turkey by July 15, 2012 (the "return order"); (2) allow the Father to visit with the children in the United States on alternating weekends prior to their return to Turkey (the "access order") in compliance with a prior order of a Turkish court; and (3) pay the Father's necessary expenses in bringing the suit (the "costs award"). *In re S.E.O.*, 873 F. Supp. 2d 536, 546 (S.D.N.Y. 2012).

Although the Mother returned the children to Turkey on July 15, 2012, she continues to contest the District Court's order in certain respects. First, with regard to the return order, she argues that her removal of the children from Turkey in 2011 was not "wrongful" under the terms of the Hague Convention because it was authorized by the Third Family Court in Üsküdar (the "Third Family Court")—a Turkish court that has been handling the Ozaltins' divorce and child-custody

---

[1] As explained in notes 4 and 5, *post*, ICARA implements the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), *opened for signature* Oct. 25, 1980, T.I.A.S. No. 11,670, which the United States has ratified as a state party. Section 11603(b) provides:

> Any person seeking to initiate judicial proceedings under the [Hague] Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

42 U.S.C. § 11603(b).

[2] As we explain below, the Mother returned the children to Turkey to visit their father for several weeks in 2011, pursuant to a Turkish court's order, but took them back to the United States in November 2011.

proceedings since February 9, 2011. Second, with regard to the access order, she argues that the District Court lacked jurisdiction to consider the Father's claim for visitation. Third, with regard to the costs award, she argues that awarding necessary expenses would be improper both because she should prevail on the merits with respect to the return order, and because of the particular circumstances of this suit.

We affirm the District Court's return order and vacate the costs award. On the merits, the Father has demonstrated that he retained custody rights under Turkish law and that the Mother's removal of the children from Turkey in 2011 interfered with the exercise of his custody rights. With regard to costs, however, we conclude that in light of the particular circumstances of this case, an award of full costs would be "clearly inappropriate." 42 U.S.C. § 11607(b)(3).[3] We remand the cause to the District Court to determine appropriate costs in the first instance.

## BACKGROUND

### A. Legal Framework

The Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention"), *opened for signature* Oct. 25, 1980, T.I.A.S. No. 11,670, to which the United States and Turkey are parties,[4] was designed "'to protect children internationally from the

---

[3] Section 11607(b)(3) provides:

> Any court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

42 U.S.C. § 11607(b)(3).

[4] "Under general principles of treaty law, a State's signing of a treaty serves only to authenticate its text; it does not establish the signatory's consent to be bound. A State only becomes bound by—that is, becomes a party to—a treaty when it ratifies the treaty." *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 256 (2d Cir. 2003) (internal quotation marks, citation, and alteration marks omitted). As a general matter, "[t]he United States becomes a 'party' to a treaty—that is, becomes contractually bound to obey its terms—only when, upon concurrence of 'two thirds of the Senators present,' U.S. Const. art. II, § 2, cl. 2, the President ratifies the treaty." *Id.* at 256 n.32. The Hague Convention uses the term "Contracting States" to refer to parties to the Convention, and it specifies that "[t]he Convention shall enter into force for a State acceding to it on the first day of the third calendar month after the deposit of its instrument of accession"

4

harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.'" *Gitter v. Gitter*, 396 F.3d 124, 129 (2d Cir. 2005) (quoting Hague Convention, Preamble). "The Convention's drafters were particularly concerned by the practice in which a family member would remove a child to jurisdictions more favorable to his or her custody claims in order to obtain a right of custody from the authorities of the country to which the child had been taken." *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012) (alterations and internal quotation marks omitted). To avert this type of forum-shopping, the Convention provides for "the prompt return of children wrongfully removed to or retained in any Contracting State." Hague Convention, art. 1. And in deference to the authority of foreign legal systems, the Convention focuses solely on "whether a child should be returned to her country of habitual residence for custody proceedings," not on resolving "any underlying custody dispute." *Mota*, 692 F.3d at 112.

The Hague Convention is self-executing in some respects,[5] having "establishe[d] legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as

---

with the Ministry of Foreign Affairs of the Netherlands, Hague Convention, art. 38, thus (in the parlance of international law) making the Netherlands the "depositary" of the treaty, *see, e.g.*, Vienna Convention on the Law of Treaties, arts. 76, 77, *opened for signature* May 23, 1969, 1155 U.N.T.S. 331, 350–51 (defining and explaining the functions of "depositaries"); *cf. Mora v. New York*, 524 F.3d 183, 196 n.19 (2d Cir. 2008) ("Although the United States has not ratified the Vienna Convention on the Law of Treaties, our Court relies on it as an authoritative guide to the customary international law of treaties, insofar as it reflects actual state practices." (internal quotation marks omitted)).

The United States signed the Hague Convention on December 23, 1981; the President submitted the treaty to the Senate, for its consideration, on October 30, 1985; the Senate gave its consent on October 9, 1986; and the President ratified the treaty on November 10, 1986. *See* T.I.A.S. No. 11,670, at 1. However, the President did not present and deposit the ratification of the United States at The Hague until April 29, 1988—the same day on which he signed ICARA—and, pursuant to Article 38 of the Hague Convention, *ante*, the treaty went into effect in the United States on July 1, 1988. *Id.*

[5] In his letter accompanying the formal presentation of the treaty to the Senate, President Reagan stated that "[f]ederal legislation will be submitted to provide for the smooth implementation of the Convention within the United States." Letter of Transmittal, Oct. 30, 1985, *reprinted in* 51 Fed. Reg. at 10,495; *see also* George P. Shultz, Letter of Submittal, Oct. 4, 1985, *reprinted in id.* at 10,497 ("The Department [of State] believes that federal legislation will be needed fully to give effect to various provisions of the Convention. Draft legislation is being prepared for introduction in both houses of Congress. The United States instrument of ratification would be deposited only after satisfactory legislation has been enacted."). A State Department official provided this account:

well as for securing the exercise of visitation rights." 42 U.S.C. § 11601(a)(4). However, in order to "ensure greater uniformity in the Convention's implementation and interpretation in the United States," and to "shorten the running-in period for effective U.S. implementation," *see* H.R. Rep. 100-525, at 17–18 (1987) (quoting the State Department's executive communication of March 6, 1987), Congress passed the International Child Abduction Remedies Act ("ICARA") on April 29, 1988, *see* 102 Stat. 437 (codified at 42 U.S.C. § 11601 *et seq.*). ICARA is designed to "establish procedures for the implementation of the Convention in the United States."[6] 42 U.S.C. § 11601(b)(1). The statute further clarifies that its provisions "are in addition to and not in lieu of the provisions of the Convention." *Id.* § 11601(b)(2).

With respect to judicial remedies, ICARA provides that "[a]ny person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action" in a state or federal court "in the place where the child is located at the time the petition is filed." *Id.* § 11603(b). Following the Convention's terms, federal law also provides that in actions brought under § 11603(b), the court "shall decide the case in accordance with the Convention." *Id.* § 11603(d). The court is limited to adjudicating "only rights under the

---

> While the Hague Convention was self-executing in form and did not require federal implementing legislation to bring it into force throughout the United States as the law of the land, the basic purpose of the Act was to fit this unique treaty smoothly into our legal system with its federal and state court systems, potential venue questions, privacy legislation, and other features that distinguish the United States from many other countries. The Advisory Committee and the State Department wanted to avoid subjecting petitioning parents to the need to settle by litigation all kinds of foreseeable substantive and procedural problems that could have been raised by lawyers in our adversarial system at considerable expense to parties and would have delayed the disposition of individual cases. It was also believed that federal legislation dealing with these matters would help to provide the maximum possible uniformity in the implementation of the Convention in all jurisdictions in this country.

Peter H. Pfund, *The Hague Convention on International Child Abduction, the International Child Abduction Remedies Act, and the Need for Availability of Counsel for All Petitioners*, 24 Fam. L.Q. 35, 42–43 (1990).

[6] Importantly, even when a treaty is "self-executing" in the sense that it creates binding federal law, the treaty still may not confer a private right of action to enforce rights recognized under the treaty. *See Medellín v. Texas*, 552 U.S. 491, 506 n.3 (2008). Because ICARA creates a private right of action to enforce rights under the Hague Convention, *see* 42 U.S.C. § 11603(b), we need not address whether the Convention itself conferred any such right.

6

Convention" and may not decide "the merits of any underlying child custody claims." *Id.*
§ 11601(b)(4). If a petitioner prevails in a return action brought under § 11603(b), the court ordinarily must "order the return of the child forthwith." Hague Convention, art. 12.

## B. Facts and Procedural History

### 1. Factual Background

Nurettin and Zeynep Ozaltin (the Father and Mother, respectively) are dual citizens of Turkey and the United States. They were married in 2001 and have two daughters, S.E.O. (currently, aged 9) and Y.O. (currently, aged 7), who are also dual citizens of Turkey and the United States. Prior to December 2010, the children resided primarily in Turkey, where they attended school.

The Mother alleges that in December 2010, she and the Father got into a heated argument about his purported drinking problem, and that during that argument he threatened her and told her to take their two children and leave. Within a day, the Mother and the children flew to New York City, where the Mother has family. The Mother alleges that during a layover in Europe, she spoke on the phone with the Father, who angrily told her that she and the children should stay in the United States.

About two weeks later, on January 7, 2011, the Father filed an application with the Turkish Ministry of Justice seeking the return of the children to Turkey pursuant to the Hague Convention. At approximately the same time, following an *ex parte* application by the Mother, the Second Family Court in Üsküdar entered a protective order barring the Father from threatening or disturbing her and the children. Shortly thereafter, on February 9, 2011, the Mother initiated divorce proceedings in the Third Family Court in Üsküdar. That court quickly ordered the Father to make temporary alimony payments to the Mother so that she could care for herself and the children.

7

In May 2011, the Father petitioned the Third Family Court for "the court to provisionally grant [him] the parental custody of the children." Joint App'x 588. In the alternative, he requested "an order that [would] require[ ] the children to be brought to Turkey and [would] grant[ ] [him] visitation rights." *Id.* On May 13, 2011, the Third Family Court declared that the Father's "request for grant of provisionary parental custody is rejected at this point," but it granted him "the possession of the children from 10 am on Saturdays until 12 pm on Sundays every first and third weeks of the month if he goes to the USA." *Id.* at 589. The Father exercised his visitation rights in New York several times between May and August 2011.

In an apparent effort to give the Father greater access to the children during the summer, the Third Family Court ordered on July 28, 2011, that "the children stay[ ] with their father . . . from 2 p.m. on the 18th of August 2011 to 2 p.m. on the 1st of September 2011." *Id.* at 592. The parties disputed the effect of this order, and on August 12, 2011, the Third Family Court clarified that its July 28 order permitted the Father to take the children out of the United States to visit him "in Turkey or in any other country." *Id.* at 596. The court further ordered that "[f]or the execution of the decision, the Turkish Republic and US passports of the children and all the other necessary documents be submitted" to the Father. *Id.* The Mother complied with this order, and the children left the United States to visit their father in Turkey on August 18.

A week later, the Father petitioned the Third Family Court to extend the visitation period in Turkey by one month, but the court rejected that request, explaining that "the children need the attention and affection of their mother." *Id.* at 602. Notwithstanding this decision, the Father retained physical custody of the children past September 1, 2011—the final day of the court-ordered visitation period. On September 7, 2011, the Mother petitioned the Third Family Court for an order requiring the Father to return the children to her. The following day, the court ordered that the "Turkish and American passports of the children . . . be returned to [the Mother] . . . given the fact

8

that the period granted to their father . . . for the establishment of a healthy parent-children relationship had ended on September 1ˢᵗ, 2011 at 2 P.M." *Id.* A week later, the court reiterated its demand, commenting that the Father had acted in bad faith "by not delivering the children [to the Mother] on the appointed date, and that the children need[ ] the care and compassion of their mother[ ]." *Id.* at 612. The Father returned the children to the Mother in Turkey on September 18, but the children and the Mother did not return to the United States until November 4, 2011, because the Father had not returned the children's passports to the Mother, claiming that the passports had been lost.

During this interim period while the children were still in Turkey, the Father filed a Hague Convention petition with the Turkish Ministry of Justice seeking to bar the Mother's effort to remove the children from Turkey a second time. The Ministry responded that "the children have been brought to Turkey from the USA" and therefore "there is not any other procedure that may be carried out in accordance with the [Hague] Convention." *Id.* at 789 (letter of October 11, 2011). The Ministry also specified that "an application may be made to the relevant Court by you to be able to take the necessary measures to prevent the residential address of the children to be change[d]." *Id.* The Father did not seek such an order from the Third Family Court.

Upon returning to the United States with the children in November 2011, the Mother "denied [the Father] the weekend visitation rights granted by the [Third Family Court], stating that she would permit [the Father] to see the Children only if he complied with conditions that the Turkish court had not imposed," *In re S.E.O.*, 873 F. Supp. 2d at 540, such as the Mother's demand that the visitation be supervised by someone of her choosing. On March 30, 2012, the Third Family Court rejected another request by the Father for temporary custody, but it ordered that he be allowed to visit with the children on alternating weekends in the United States pursuant to the same visitation schedule that the court had ordered on May 13, 2011.

9

## *2. Procedural History*

On March 30, 2012—the same day that the Third Family Court ordered that the Father should have access to the children in the United States—the Father filed this action in the United States District Court for the Southern District of New York under 42 U.S.C. § 11603(b), *see* note 1, *ante*, seeking: (1) an order enforcing his visitation rights, pursuant to Article 21 of the Hague Convention[7]; (2) an order requiring the Mother to return the children to Turkey, pursuant to Article 12 of the Hague Convention[8]; and (3) a costs award in an amount to be determined at the end of the litigation, pursuant to Article 26 of the Hague Convention.[9]  A few days later, on April 2, the District Court granted the following interim relief:

---

[7] Article 21 provides:

> An application to make arrangements for organizing or securing the effective exercise of rights of access may be presented to the Central Authorities of the Contracting States in the same way as an application for the return of a child.

> The Central Authorities are bound by the obligations of co-operation which are set forth in Article 7 to promote the peaceful enjoyment of access rights and the fulfillment of any conditions to which the exercise of those rights may be subject.  The Central Authorities shall take steps to remove, as far as possible, all obstacles to the exercise of such rights.

> The Central Authorities, either directly or through intermediaries, may initiate or assist in the institution of proceedings with a view to organizing or protecting these rights and securing respect for the conditions to which the exercise of these rights may be subject.

[8] Article 12 provides:

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

> Where the judicial or administrative authority in the requested State has reason to believe that the child has been taken to another State, it may stay the proceedings or dismiss the application for the return of the child.

[9] Article 26 provides, in relevant part:

> Upon ordering the return of a child or issuing an order concerning rights of access under this Convention, the judicial or administrative authorities may, where appropriate, direct the person who removed or retained the child, or who prevented the exercise of rights of access, to pay necessary expenses incurred by or on behalf of the applicant, including travel expenses, any costs incurred or

1) an order requiring [the Mother] to allow [the Father] the visitation rights granted him by the Turkish Court during the pendency of this action; 2) an order prohibiting the removal of the Children from New York State during the pendency of this action; and 3) an order requiring the surrender of the Children's United States passports to the Court for the pendency of this action.

*In re S.E.O.*, 873 F. Supp. 2d at 540. On the same date, the Court also ordered the Mother to show cause why the petition for relief should not be granted in full.

In April and May of 2012, the parties submitted extensive evidence and briefing regarding the merits of the Father's return claim and access claim. The District Court also held two evidentiary hearings. During these hearings, the Mother testified about events relating to her removal of the children from Turkey, and each party offered expert-witness testimony about the parents' purported custody rights under Turkish law. As the District Court summarized:

> At the April 30, 2012, and May 1, 2012, hearings, both [the Father] and [the Mother] proffered testimony by Turkish legal experts as to the parties' respective custody rights. [The Mother's] expert witness, Mr. Cetin Yildirimakin (who represents [the Mother] in the Turkish divorce proceedings), testified that, once parties separate, a Turkish court *must* grant provisional custody of the children to one parent or the other. (Hearing Tr. 179.) Mr. Yildirimakin testified in a conclusory fashion that the various orders issued by the Turkish Court award [the Mother] provisional custody of the Children and that, by granting [the Father] visitation rights in the United States, the Turkish Court implicitly acknowledged that the Children need not be returned to Turkey. (*See, e.g.,* Yildirimakin Decl. ¶¶ 8–24.)

> In contrast, [the Father's] expert, Professor Sebnem Akipek Ocal, testified that, during the pendency of divorce proceedings, Turkish courts will typically order children to live with one spouse, but that such an order is not tantamount to a grant of provisional custody, and does nothing to alter the custodial rights of the non-resident spouse. (Hearing Tr. 27–29, 37–41, 39, 52–55, 59–62; Akipek Report 7–15.) Professor Akipek testified that the orders issued by the Turkish Court to date provided only that the Children would live with [the Mother] during the divorce proceedings and should not be read to "constitute or 'imply' a termination or suspension of [the Father's] custodial rights." (Akipek Report 17–18.)

> Professor Akipek further testified that the Turkish Court lacked the power to order [the Mother] to return to the United States with the Children, because of the pending Hague Convention petition. (Hearing Tr. 50–51.) Burcu Siratas, [the Father's] Turkish divorce lawyer, corroborated this point, testifying that, at the

---

payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child.

11

parties' first appearance in the divorce proceeding, she had advised the Turkish Court that [the Father] had filed a Hague Convention application with the Turkish Ministry of Justice and that the Turkish Court had instructed her to continue with that application process. (Hearing Tr. 175.) The Ministry, which is Turkey's designated Central Authority for purposes of the Hague Convention, has indicated that [the Father] and [the Mother] have joint custody of the Children: on April 5, 2012, Judge Seval Arslan of the Ministry wrote to the Department of State, the United States' designated Central Authority, and stated that "although there is a pending divorce case between the parents before the Family Court in Üsküdar, the parents still have joint-custody rights and at the time of the wrongful removal they also use [sic] to exercise those rights. In this context under Articles 3 and 12 of the Hague Convention, the [Mother] is in breach of rights of the [sic] custody under the law of Turkey in which the children were habitually resident before the removal[.]" (Petitioner's Exhibit 40.)

*In re S.E.O.*, 873 F. Supp. 2d at 542–43.

Based on this testimony and the submitted materials, the District Court issued a memorandum opinion and order on June 5, 2012, requiring the Mother to (1) comply with the Turkish court's visitation order, (2) return the children to Turkey by July 15, 2012, and (3) pay the Father for any "necessary expenses" incurred in connection with the suit. With regard to the return action, the District Court concluded that the Third Family Court's orders were not determinative of the parties' respective custody rights during their divorce proceedings. "At best," the District Court stated, "the conflicting testimony of Professor Akipek and Mr. Yildirimakin as to which party has legal custody of the Children raises questions as to Turkish custody law and the intent of the Turkish Court. Both these questions are more appropriately resolved by the Turkish Court." *Id.* at 544. The District Court concluded:

> Based on the plain language of the Turkish Civil Code's joint custody provision and the evidence concerning the parties' relevant actions and interactions, the Court concludes that [the Father] has met his burden of showing that [the Mother's] retention of the Children in the United States is wrongful under the Convention. Returning the Children to Turkey would serve the purposes of the Convention by giving both parties the opportunity to litigate and clarify custody issues in the home forum. . . .
>
> Such return will enable the Turkish Court to consider and address directly the question of whether the Children should continue to reside in New York while the divorce proceedings are pending.

*Id.* To allow the children to finish the school year in the United States, the Court set a deadline of July 15, 2012, for the Mother to take the children back to Turkey. *Id.* at 545–46.

With regard to the access claim, the District Court began by explaining that, contrary to the Mother's arguments, federal courts have jurisdiction under 42 U.S.C. § 11603(b) to consider access claims. *Id.* at 545. On the merits, the Court had little to decide because the Third Family Court already had adjudicated the father's visitation rights. Accordingly, the District Court ordered that the Mother "comply with the visitation rights set forth by the Turkish Court's May 13, 2011, Order, so long as the Children remain in the United States." *Id.* at 546. Finally, after quoting the relevant costs provision of the Hague Convention, *see* note 9, *ante*, and 42 U.S.C. § 11607(b)(3), *see* note 3, *ante*, the District Court concluded: "As the Court is granting the Petition, [the Mother] will be required to pay any necessary costs [that the Father] incurred in connection with this action." *In re S.E.O.*, 873 F. Supp. 2d at 546.

### 3. Intervening Developments

On July 15, 2012, the Mother returned the children to Turkey pursuant to the District Court's order. Since then, Turkish courts have issued several orders pertinent to questions raised in this appeal.[10] The Tenth Family Court in Ankara[11] entered an amended order dated July 16, 2012, enjoining the children from "go[ing] abroad without [the Father's] permission and consent." Appellee's Br. at ADD-48–49. On August 3, 2012, the Third Family Court granted the Mother temporary custody of the couple's two children and, referring to the Mother's residence in the United States, also granted the Father visitation rights in the United States. *Id.* at 55. At the time it issued the order, the Third Family Court was apparently under the mistaken impression that the

---

[10] On September 14, 2012, we granted the Father's unopposed motion to take judicial notice of these recent Turkish orders. *See* Docket Entry Nos. 124 & 128. The parties both represented at oral argument on October 23, 2012, that the divorce and custody proceedings in Turkey are ongoing.

[11] The Father apparently moved for this order before the Tenth Family Court in Ankara rather than the Third Family Court in Üsküdar, where divorce proceedings were ongoing.

13

Mother still resided with the children in the United States and was unaware that they had recently returned to Turkey pursuant to the District Court's order. The Father then alerted the Third Family Court to the District Court's decision and the children's subsequent return to Turkey, and asked that the court reconsider its grant of temporary custody to the Mother. On August 15, 2012, the Third Family Court rescinded its August 3 order, stating that it would "decide on this subject after the finalization of the decision of the US Court regarding the returning of the children to Turkey." *Id.* at 61. The Third Family Court also amended its visitation order by providing that the Father would have visitation rights "in Turkey." *Id.*

### *4. Appeal*

On appeal, the Mother argues that the District Court erred by ordering her to take the children back to Turkey pursuant to the Hague Convention. In particular, the Mother asserts that she removed the children from Turkey in November 2011 with the consent of the Third Family Court. She cites the Third Family Court's September 2011 orders mandating that the Father return the children and their passports so that the children could return to the United States with her. The Mother also draws our attention to the Third Family Court's orders granting the Father visitation rights in the United States. She argues that it is "clear from the [Third Family] Court's orders that the court authorized [the Mother] to live with the children in the United States and that it did so in spite of [the Father's] repeated and strenuous objections." Appellant's Br. 23. The Mother further asserts that the District Court's order "reversed those [Third Family Court] orders *sub silentio*," thus contravening the Hague Convention's purpose of empowering courts in the country of the children's habitual residence to resolve custody disputes. *Id.* at 21.

With regard to the right of access claim, the Mother argues, as she did before the District Court, that "federal courts lack subject matter jurisdiction over claims seeking to enforce rights of access." Appellant's Br. 26 (citing *Wiezel v. Wiezel-Tyrnauer*, 388 F. Supp. 2d 206, 211 (S.D.N.Y.

14

2005); *Bromley v. Bromley*, 30 F. Supp. 2d 857, 860 (E.D. Pa. 1998)).  The relevant provision of the Hague Convention—Article 21, *see* note 7, *ante*—does not mention *judicial* remedies for enforcing access rights, the Mother argues, and therefore such remedies cannot be available under ICARA.  She also asserts that the access claim is now moot in light of the children's return to Turkey and the intervening orders issued by the Third Family Court.

Finally, the Mother disputes the District Court's costs award on several grounds.  First, she argues that the District Court erred on the merits of the Father's return claim, and therefore any award of costs is inappropriate.  Second, she asserts that even if the return order was warranted, "the fee award should nevertheless be reversed because a fee award in this case is 'clearly inappropriate' under [42 U.S.C. § 11607(b)(3)]," Appellant's Br. 24, principally because she "justifiably relied on the [Third Family] Court's orders, which facilitated the children's return to the United States in November 2011," *id.* at 25.  Third, she points out that she "has not tried to avoid the Turkish Court's jurisdiction" and even "expressly submitted to that court's jurisdiction by filing her divorce petition in Turkey."  *Id.*  In these circumstances, she argues, a fees award would penalize her "for taking actions that she reasonably believed were authorized" under Turkish law.  *Id.*  Finally, she notes that the Father's fees request is "astronomical, nearly $700,000."  *Id.*

## DISCUSSION

### A. Return Order

On appeal, the Mother argues that her removal of the children from Turkey in 2011 did not breach any of the Father's custody rights because she acted with the explicit and implicit authorization of the Third Family Court—the Turkish court that has been primarily in charge of handling the parties' divorce and custody proceedings in Turkey.  For the reasons stated below, we disagree with the Mother's arguments and affirm the District Court's return order.

15

### 1. Legal Framework

The Hague Convention provides that "[w]here a child has been wrongfully removed[,] . . . the authority concerned shall order the return of the child forthwith." Hague Convention, art. 12. The Convention defines "rights of custody" as "includ[ing] rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.*, art. 5. It defines a wrongful removal as one that "is in breach of rights of custody . . . , either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention" and that occurred at a time when "those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Id.*, art. 3.[12]

One of the key purposes of the Convention is "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Id.*, art. 1. The *definition* of "rights of custody" under the Convention is an issue of treaty interpretation and does not depend on the domestic custody law of the country of habitual residence. *Abbott v. Abbott*, 130 S. Ct. 1983, 1991 (2010). The *substance* of those custody rights, however, is provided by the domestic law "of the State in which the child was habitually resident immediately before the removal[,] . . . or by reason of a judicial or administrative decision, or by reason of an agreement

---

[12] Article 3 provides, in full:

> The removal or the retention of a child is to be considered wrongful where—
>
>     a)   it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
>     b)   at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Hague Convention, art. 3.

having legal effect under the law of that State."[13]  Hague Convention, art. 3, *see* note 12, *ante*.  In

other words, domestic law (including certain public decisions and private agreements) supplies the

substance of parental rights,[14] but the relevant provisions of the Hague Convention determine

whether those rights are considered "rights of custody" under the Convention.

As the Supreme Court has explained, "the Convention's broad definition" of "rights of

custody" is not constrained to "traditional notions of physical custody."  *Abbott*, 130 S. Ct. at 1991.

Instead, the Convention recognizes the "increasingly common" exercise of "[j]oint legal custody, in

which one parent cares for the child while the other has joint decisionmaking authority concerning

the child's welfare."  *Id.*  For instance, if the law of the country of habitual residence "confers upon

the father the joint right to determine his child's country of residence," that joint right "is a right of

custody under the Convention."  *Id.* at 1993.  On the other hand, the Hague Convention only

requires the return of a child if the removal was "wrongful," which occurs if the parent who

removed the child did so "in breach of rights of custody" of the other parent.[15]  Hague Convention,

art. 3, *see* note 12, *ante*.  Accordingly, if one parent has lawful authority to change the residence of the

child and doing so will not breach the other parent's custody rights, that parent may remove the

child without being subject to a return remedy under the Hague Convention.  *See, e.g.*, *Shealy v. Shealy*,

---

[13] The Hague Convention also provides for the recognition of foreign law and foreign decisions in an expeditious manner:

> In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognised or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.

Hague Convention, art. 14.

[14] For ease of reference, and in light of the facts of this case, we generally refer to "parental" rights, though we note that the Hague Convention refers more generally to the custody rights of "a person, an institution or any other body." Hague Convention, art. 3, *see* note 12, *ante*.

[15] As noted above, the domestic law of the country of habitual residence (including certain public decisions and private agreements) supplies the substance of parental rights under the term of the Hague Convention.  *See* Hague Convention, art. 3, which is reprinted in note 12, *ante*.

295 F.3d 1117, 1124 (10th Cir. 2002) (holding that an "interim decision" of a court in the resident country was "determinative . . . as to whether [respondent's] action represented a wrongful removal" because it "granted [respondent] the right to remove [the child] from Germany" in the circumstances presented).

In cases arising under the Hague Convention and ICARA, we review a district court's factual findings for clear error and its legal conclusions *de novo*. *Lozano v. Alvarez*, 697 F.3d 41, 49 (2d Cir. 2012). Legal conclusions include interpretations of the Convention and applications of the appropriate legal standards to the facts. *Id.* at 49–50. Our review of questions of foreign law is governed by Rule 44.1 of the Federal Rules of Civil Procedure:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

Fed. R. Civ. P. 44.1; *see also, e.g.*, *Ackermann v. Levine*, 788 F.2d 830, 838 n.7 (2d Cir. 1986) (applying Rule 44.1 in an action under the Hague Convention).

## 2. Analysis

We affirm the return order for substantially the reasons stated in the District Court's well-reasoned opinion. *See In re S.E.O.*, 873 F. Supp. 2d at 542–45. We begin our analysis by summarizing several aspects of the District Court's decision that the parties do not dispute on appeal.

For the purposes of this appeal, the parties agree that the children's country of habitual residence is Turkey. Appellant's Br. 13; Appellee's Br. 15. The parties also agree that under Turkish law, absent any Turkish order to the contrary, parents retain joint custody rights of their children while divorce proceedings are pending. Appellant's Br. 18; Appellee's Br. 16-17; *see* Turkish Civil

18

Code § 6, arts. 335,[16] 336.[17]  Finally, the parties agree that the Third Family Court has authority

under Turkish law to award custody to one of the parents, both during and at the conclusion of the

divorce proceedings.  Appellant's Br. 17-18; Appellee's Br. at 16-17; *see* Turkish Civil Code, § 6,

art. 169[18]; *see also* Supplemental App'x 34 (Revised Report of Expert Witness Sebnem Akipek Ocal,

Ph. D. ["Akipek report"]) ("[T]he powers of a court in a divorce or separation action include the

power to remove custodial rights from one parent (and thus give sole custody to the other parent)

. . . .").  Accordingly, the pivotal issue in this case is whether the Third Family Court actually

exercised that authority, either by granting sole custody rights to the Mother,[19] or by redefining the

parents' respective rights such that the Mother could take the children to the United States without

breaching the Father's custody rights.

    The District Court's conclusion that the Father retained custody rights under Turkish law

was well-founded.  The Turkish Ministry of Justice—the Turkish "Central Authority" within the

---

[16] Article 335 provides: "Minor is under the custody of his/her parents. Custody shall not be taken from the parents unless there is a legal reason.  Unless the judge requires to appoint a guardian, disabled majors shall also stay under the custody of their parents."  Turkish Civil Code § 6, art. 335, *available at* http://www.hcch.net/upload/abduct2011cp_tr1.pdf (last visited Feb. 8, 2013) (website of the Hague Conference on Private International Law).

[17] Article 336 provides, in relevant part: "Parents shall use the custody together as long as marriage lasts.  If the common life is terminated or separation is realised, the judge may entrust the custody to one of the spouses."  Turkish Civil Code § 6, art. 336, *available at* http://www.hcch.net/upload/abduct2011cp_tr1.pdf (last visited Feb. 8, 2013) (website of the Hague Conference on Private International Law); *see also* Appellee's Br. at ADD-30 (providing another translation of art. 336).

[18] Article 169 provides, in relevant part: "When a divorce or separation case is filed, the judge shall take sua sponte temporary measures necessary for the duration of the lawsuit particularly those concerning . . . the care and protection of the children."  Appellee's Br. at ADD-30.

[19] By "sole custody rights to the Mother," we mean that the Father would, at least for the time being, not retain *any* "rights of custody" (as understood under the Hague Convention)—including a so-called "*ne exeat*" right to block the Mother from removing the children from Turkey, *see Abbott*, 130 S. Ct. at 1987 (holding that "a parent has a 'righ[t] of custody' by reason of that parent's *ne exeat* right: the authority to consent before the other parent may take the child to another country")—and therefore no "rights of custody" of the Father could be breached because none would exist.  Of course, whether a particular country's provisional or temporary grant of "sole custody" (as a term of art under domestic law) terminates the other parent's *ne exeat* right depends on that country's law.

19

meaning of the Hague Convention[20]—submitted a letter to the U.S. Department of State explaining that "although there is a pending divorce case between the parents before the Family Court in Üsküdar, the parents still have joint-custody rights and at the time of the wrongful removal they also use[d] to exercise those rights." Joint App'x 793 (letter of April 5, 2012). The Ministry of Justice explained that the Mother, therefore, was "in breach of [the Father's] rights of [ ] custody under the law of Turkey in which the children were habitually resident before the removal." *Id.* at 794 (letter of April 9, 2012).

The Mother disputes this conclusion, arguing that the Ministry of Justice was not aware of the various orders of the Third Family Court in Üsküdar purportedly granting (or at least endorsing) her custody of the children. Be that as it may, a removal under the Hague Convention can still be "wrongful" even if it is lawful. As the official Hague Conference reporter stated:

> [F]rom the Convention's standpoint, the removal of a child by one of the joint holders without the consent of the other, is . . . wrongful, and this wrongfulness derives in this particular case, not from some action in breach of a particular law, but from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise. The Convention . . . seeks . . . to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties.

Elisa Pérez-Vera, Explanatory Report: Hague Conference on Private International Law ¶ 71, *in* 3 *Acts and Documents of the Fourteenth Session* 426, 447–48 (1982).[21] In this case, the evidence offered at

---

[20] The Hague Convention requires each party to designate a Central Authority, *see* Hague Convention, art. 6, which has various responsibilities under the Convention, such as a duty "to discover the whereabouts of a child who has been wrongfully removed or retained" and "to initiate or facilitate the institution of judicial or administrative proceedings with a view to obtaining the return of the child and, in a proper case, to make arrangements for organizing or securing the effective exercise of rights of access," *id.*, art. 7. The Central Authority for the United States is the State Department, within which the Office of Children's Issues handles the Department's responsibilities as Central Authority. *See Abbott*, 130 S. Ct. at 1993.

[21] As we recently explained:

> Elisa Pérez-Vera was "the official Hague Conference reporter for the Convention." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. [10,494,] 10,503 [(Mar. 26, 1986)]. "Her explanatory report [was] recognized by the Conference as the official history and commentary on the Convention," *id.*, and we have previously held that "it is an authoritative

trial showed that the Father retained custody rights—including the right to determine the children's residence—under Turkish law, even if the Mother had primary custody of the children.

Most importantly, the Mother has not pointed to an order of the Third Family Court explicitly recognizing her sole custody of the children, or explicitly recognizing her right to remove the children to the United States without breaching the custody rights of the Father. The available materials and testimony at trial regarding Turkish law explain that an explicit order is necessary under Turkish law before a court may terminate a parent's custody rights. The District Court found credible Professor Akipek's testimony that "a parent's custodial rights may be lawfully terminated [under Turkish law] only by an order stating explicitly that custodial rights are being terminated . . . . A termination of custodial rights . . . is not to be *inferred* based on an order simply stating with which parent the child shall live during that time . . . ." Supplemental App'x 40 (Akipek report) (emphasis in original). Having reviewed the relevant Turkish orders, Professor Akipek further testified that "Mr. Ozaltin continues to have shared custody of the common children." *Id.* at 31; *see also* Joint App'x 408–09 (testimony of Prof. Akipek) (stating that the Turkish orders "[d]efinitely [did] not" award the Mother sole custody, temporary or otherwise). The District Court found this testimony credible and persuasive. *See In re S.E.O.*, 873 F. Supp. 2d at 543–44.

Having reviewed *de novo* the District Court's interpretations of foreign law, *see Nordwind v. Rowland*, 584 F.3d 420, 429 (2d Cir. 2009), we agree with the Court's analysis and conclusion. The Mother has not offered a persuasive rebuttal to Professor Akipek's testimony that "[a] termination of custodial rights . . . is not to be *inferred* based on an order simply stating with which parent the child[ren] shall live," Supplemental App'x 40 (emphasis in original), and she has not presented any Turkish orders (issued prior to her removal of the children in 2011) that explicitly granted her sole

<hr />

source for interpreting the Convention's provisions," *Croll v. Croll*, 229 F.3d 133, 137 n.3 (2d Cir. 2000) (citation omitted), *abrogated on other grounds by Abbott*, 130 S. Ct. 1983; *see also Gitter*, 396 F.3d at 129 & n.4.

*Lozano v. Alvarez*, 697 F.3d 41, 52 n.11 (2d Cir. 2012).

custody of the children or otherwise redefined the parties' respective rights such that she could remove the children to the United States without breaching the Father's rights of custody. Accordingly, while we make no comment on the merits of the underlying custody dispute, *Mota*, 692 F.3d at 112, we hold that the children were wrongfully removed under the Hague Convention, and we affirm the District Court's return order.

## B. Costs

The District Court awarded to the Father "any necessary costs . . . incurred in connection with this action." *In re S.E.O.*, 873 F. Supp. 2d at 546. The Mother challenges this award on several grounds. With respect to the fees incurred in seeking to enforce the Father's rights of access, she argues that the visitation order is now moot and therefore cannot sustain a fees award. Additionally, she argues that federal courts do not have jurisdiction to hear claims of access under ICARA. *See* 42 U.S.C § 11603(b). With respect to fees incurred in seeking a return order, the Mother argues that it would be inappropriate to award costs given the circumstances of the case.[22] We address these arguments in turn.

### 1. Mootness of Visitation Order

On appeal, the parties agree that the District Court's visitation order is now moot. *See* Appellant's Br. 26; Appellee's Br. 41–42. We need not accept the parties' legal conclusion regarding mootness, *see generally Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991), but in the circumstances of this case we need not consider mootness. First, the Mother's failure to contest the visitation order on the merits means that she has waived any objection to that aspect of the District Court's order. *See LoSacco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir. 1995) (issues not raised on appeal are waived). Because there is no appeal on the merits of the visitation order, we have no reason to

---

[22] The Mother also argues that an award of costs was improper because the District Court erred on the merits in issuing a return order. Given our holding to the contrary, *see* Part A, *ante*, this argument is not a valid basis for reversing the District Court's costs award.

consider whether such an appeal would be moot. Second, even if any controversy regarding the visitation order itself were now moot, we would still have jurisdiction to consider whether an award of fees was proper in these circumstances. *See Kirk v. N.Y. State Dep't of Educ.*, 644 F.3d 134, 137 (2d Cir. 2011) (allowing for the recovery of fees even "where the appeal on the merits was dismissed as moot and the district court's judgment was vacated"); *cf. Dahlem v. Bd. of Educ. of Denver Pub. Sch.*, 901 F. 2d 1508, 1511 (10th Cir. 1990) ("While a claim of entitlement to attorney's fees does not preserve a moot cause of action, the expiration of the underlying cause of action does not moot a controversy over attorney's fees already incurred." (internal citations omitted)). In sum, we have no reason to consider whether the visitation order is moot.

## 2. Right of Action under § 11603(b)

The Mother argues that "federal courts lack subject matter jurisdiction over claims seeking to enforce rights of access." Appellant's Br. 26 (citing *Wiezel*, 388 F. Supp. 2d at 211; *Bromley*, 30 F. Supp. 2d at 860). Rather, she claims, petitioners may seek to enforce rights of access only in state court or through the State Department, which is the United States's designated "Central Authority" under the Hague Convention. *See* note 20, *ante* (explaining the term "Central Authority"). Properly framed, the Mother's argument is not *jurisdictional* in nature but instead goes to whether § 11603(b) creates a federal right of action.[23] One circuit has held that it does not. *See Cantor v. Cohen*, 442 F.3d 196 (4th Cir. 2006). We disagree.[24]

---

[23] As a general matter, "[t]he question whether a federal statute creates a claim for relief is not jurisdictional." *Northwest Airlines, Inc. v. County of Kent.*, 510 U.S. 355, 365 (1994). Instead, "[a] plaintiff properly invokes § 1331 jurisdiction when she pleads a *colorable* claim 'arising under' the Constitution or laws of the United States." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 (2006) (emphasis supplied). By contrast, "[a] claim invoking federal-question jurisdiction under 28 U.S.C. § 1331 . . . may be dismissed for want of subject-matter jurisdiction if it is not colorable, *i.e.*, if it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or is 'wholly insubstantial and frivolous.'" *Id.* at 513 n.10 (quoting *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)). In this case, subject-matter jurisdiction is also supplied by 42 U.S.C. § 11603(a).

[24] Although we do not consider the underlying merits of the Father's access claim, we nonetheless consider whether he has asserted a valid right of action because that issue directly bears on the scope of a permissible award of "necessary expenses" under § 11607.

The statutory basis for a federal right of action to enforce access rights under the Hague Convention could hardly be clearer. According to the enacting legislation, "[t]he courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the [Hague] Convention." 42 U.S.C. § 11603(a). The statute then announces the actions falling within that category:

> Any person seeking to initiate judicial proceedings under the Convention *for the return of a child* or *for arrangements for organizing or securing the effective exercise of rights of access to a child* may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

*Id.* § 11603(b) (emphases supplied). Later the statute provides for the relevant burden of proof in access cases: "A petitioner in an action brought under subsection (b) of this section shall establish by a preponderance of the evidence . . . *in the case of an action for arrangements for organizing or securing the effective exercise of rights of access*, that the petitioner has such rights." *Id.* § 11603(e)(1)(B) (emphasis supplied).

These statutory provisions straightforwardly establish that a petitioner may "initiate judicial proceedings under the Convention . . . for organizing or securing the effective exercise of rights of access to a child," *id.* § 11603(b),[25] and that "United States district courts shall have concurrent

---

[25] The phrase "in any court which has jurisdiction of such action," 42 U.S.C. § 11603(b), underscores that while § 11603(a) confers jurisdiction in a particular federal forum (*i.e.*, in United States district courts), it does not confer jurisdiction in *particular* state courts (*e.g.*, a family-law court; a juvenile court; or a court of general jurisdiction); the appropriate state forum for an action under the Hague Convention is an issue of state law. The court in which the petition is filed must also be "authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." *Id.* As Judge Traxler explained, the concurrent state-federal jurisdiction in § 11603(a) does not interfere with American states' usual role in resolving family-law matters:

> [T]he inquiry called for under section 11603(e) is very limited—the court need only decide whether "the petitioner has such rights" of access. 42 U.S.C.A. § 11603(e)(1)(B). . . . This limited inquiry does not require federal courts to plumb the depths of family law; in fact, it requires no greater degree of entanglement with family law than does the determination of whether a child has been removed in violation of existing custody rights. Such a limited inquiry is consistent with Convention policy goals that the status quo be returned rapidly, without regard to the underlying merits, and enforced until a court of competent jurisdiction revisits the merits.

*Cantor*, 442 F.3d at 212–13 (Traxler, J., dissenting).

24

original jurisdiction" over such actions, *id.* § 11603(a). Moreover, § 11603(e)(1)(B) underscores that actions arising under the Convention include "an action for arrangements for organizing or securing the effective exercise of rights of access." Accordingly, § 11603 unambiguously creates a federal right of action to secure the effective exercise of rights of access protected under the Hague Convention.

In denying a federal right of action to enforce access rights, the Fourth Circuit relied heavily on Article 21 of the Convention, which provides:

> An application to make arrangements for organizing or securing the effective exercise of rights of access may be presented to the Central Authorities of the Contracting States in the same way as an application for the return of a child.

> The Central Authorities are bound by the obligations of co-operation which are set forth in Article 7 to promote the peaceful enjoyment of access rights and the fulfillment of conditions to which the exercise of those rights may be subject. The Central Authorities shall take steps to remove, as far as possible, all obstacles to exercise of such rights.

> The Central Authorities, either directly or through intermediaries, may initiate or assist in the institution of proceedings with a view to organizing or protecting these rights and securing respect for the conditions to which the exercise of those rights may be subject.

Hague Convention, art. 21; *see Cantor*, 442 F.3d at 199–201.

The Fourth Circuit interpreted Article 21 as stating that access rights can *only* be vindicated by applying to the State Department, which is the United States's designated "Central Authority" under the Hague Convention. *See* note 20, *ante* (explaining the term "Central Authority"). Article 21, however, provides that efforts to secure rights of access "may" be initiated through an application to a country's Central Authority, not that they "may *only*" be pursued in this way. Elsewhere the Hague Convention explicitly recognizes that if a Contracting State provides a judicial forum, petitioners seeking to enforce access rights may initiate judicial proceedings directly:

> This Convention shall not preclude any person . . . who claims that there has been a breach of custody or access rights within the meaning of Article 3 or 21 from

applying directly to the judicial or administrative authorities of a Contracting State, whether or not under the provisions of this Convention.

Hague Convention, art. 29. Thus, as the State Department has explained, initiating a petition with a State's Central Authority "is a nonexclusive remedy" for enforcing access rights. *Legal Analysis of the Hague Convention on the Civil Aspects of International Child Abduction*, 51 Fed. Reg. 10,494, 10,504 (Mar. 26, 1986). "Article 29 permits the person who claims a breach of custody or access rights, as defined by Articles 3 and 21, to bypass the Convention completely," *id.*, by invoking other applicable laws or procedures, such as provisions in ICARA.

Bolstering our conclusion is the apparent lack of any administrative apparatus for enforcing rights of access. Rather, a Central Authority (such as the State Department) that receives a petition under the Hague Convention must offer *facilitative* services to the petitioner, such as taking appropriate measures to "discover the whereabouts of [the] child," "bring about an amicable resolution of the issues," and, as particularly relevant here, "initiate or facilitate the institution of judicial or administrative proceedings with a view to obtaining the return of the child and, in a proper case, to make arrangements for organising or securing the effective exercise of rights of access." Hague Convention, art. 7. Of course, this role is often of critical importance to parties seeking judicial relief. For instance, the State Department "has engaged in time-consuming efforts in many cases to identify practicing family lawyers in the jurisdiction where a child is located who are willing to serve as counsel for a petitioning parent on a pro bono or reduced-fee basis." Peter H. Pfund, *The Hague Convention on International Child Abduction, the International Child Abduction Remedies Act, and the Need for Availability of Counsel for All Petitioners*, 24 Fam. L.Q. 35, 48 (1990). But the State Department itself does not have authority to enforce access rights, nor is preauthorization from the State Department required for petitioners who wish to pursue judicial relief without assistance. In sum, the facilitative role that Central Authorities assume under the Hague Convention does not

displace or inhibit the ability of a party to vindicate his or her rights directly in federal or state court under § 11603(b).

To be sure, some commentators have criticized the Hague Convention (and Article 21 in particular) for having "no firm legal provisions to enforce [access] rights." *Hague Conference on Private International Law: Report of the Second Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction*, Jan. 18-21, 1993, *reprinted in* 33 I.L.M. 225, 244. But while Article 21 may not require a signatory country to establish judicial avenues for enforcing access rights under the Convention, Article 21 does not conflict with the unambiguous recognition of a federal right of action in § 11603.

In sum, even though not *required* under Article 21, federal law in the United States provides an avenue for aggrieved parties to seek judicial relief directly in a federal district court or an appropriate state court. *See* 42 U.S.C. § 11603(a), (b); *see also Taveras v. Taveraz*, 477 F.3d 767, 777 n.7 (6th Cir. 2007) ("[U]nlike The Hague Convention, the ICARA, 42 U.S.C. § 11603, does provide for judicial remedies for non-custodial parents, namely for rights of access claims (*e.g.*, visitation).").

### 3. Appropriateness of the Costs Award

Lastly, the Mother argues that the District Court's award of "any necessary costs Petitioner incurred in connection with this action" was clearly inappropriate given the circumstances of this case. For the reasons stated below, we vacate the District Court's costs award and remand for further proceedings consistent with this decision.

### a. Legal Framework

The Hague Convention provides that "[u]pon ordering the return of a child or issuing an order concerning rights of access under this Convention, the judicial or administrative authorities *may*, where appropriate, direct the person who removed or retained the child . . . to pay necessary expenses incurred by . . . the applicant." Hague Convention, art. 26 (emphasis supplied). These

27

"necessary expenses" may include "travel expenses, any costs incurred or payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child." *Id.* ICARA provides that

> Any court ordering the return of a child pursuant to an action brought under section 11603 of this title *shall order* the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, *unless* the respondent establishes that such order would be *clearly inappropriate.*

42 U.S.C. § 11607(b)(3) (emphases supplied).[26] A district court's costs award under the Hague Convention is reviewed for abuse of discretion, *see Norinder v. Fuentes*, 657 F.3d 526, 536 (7th Cir. 2011); *Whallon v. Lynn*, 356 F.3d 138, 140 (1st Cir. 2004), keeping in mind that "[a] district court has abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions," *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (internal citations, quotation marks, and alterations omitted).

Although Article 26 of the Hague Convention provides that a court "may" award "necessary expenses" to a prevailing petitioner, § 11607(b)(3) shifts the burden onto a losing respondent in a return action to show why an award of "necessary expenses" would be "clearly inappropriate." 42 U.S.C. § 11607(b)(3); *see Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 346 (5th Cir. 2004). Nonetheless, § 11607(b)(3) retains what we have previously described as the "equitable" nature of cost awards. *Moore v. County of Delaware*, 586 F.3d 219, 221 (2d Cir. 2009). As the First Circuit has explained:

---

[26] The District Court "order[ed] the return of a child pursuant to an action brought under section 11603," 42 U.S.C. § 11607(b)(3), thus enabling the Court to award "necessary expenses," including fees relating to the enforcement of access rights, *id.*; *cf. id.* § 11603(b) (explaining that an "action" under the Hague Convention includes the remedy of "the return of a child" and "arrangements for organizing or securing the effective exercise of rights of access to a child"). Accordingly, we need not consider whether a district court may award fees if it only enforces rights of access without issuing a return order.

> The district court has the duty, under 42 U.S.C. § 11607(b)(3), to order the payment of necessary expenses and legal fees, subject to a broad caveat denoted by the words, "clearly inappropriate." . . . We . . . read the statute as giving the district court broad discretion in its effort to comply with the Hague Convention consistently with our own laws and standards.

*Whallon*, 356 F.3d at 140. Accordingly, a prevailing petitioner in a return action is presumptively entitled to necessary costs, subject to the application of equitable principles by the district court. Absent any statutory guidance to the contrary, the appropriateness of such costs depends on the same general standards that apply when "attorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994). "There is no precise rule or formula for making these determinations, but instead equitable discretion should be exercised in light of the [relevant] considerations." *Id.* (internal quotation marks omitted).

### b. Analysis

Having articulated the governing legal principles, we turn to the present case. We vacate the District Court's award of "any necessary costs [that the Father] incurred in connection with this action," *In re S.E.O.*, 873 F. Supp. 2d at 546, because the Mother had a reasonable basis for removing the children to the United States. We also have concerns that, contrary to the spirit of the Hague Convention, the Father may have engaged in forum-shopping with respect to certain aspects of this suit.

### i.

A series of court orders in Turkey demonstrate that even though the Mother's removal of the children to the United States deprived the Father of certain custody rights under Turkish law, she nonetheless had a reasonable basis for thinking at the time of removing the children to the United States in 2011 that her actions were consistent with Turkish law. Although mistake of law is not a defense to the return action itself, it is a relevant equitable factor when considering whether a costs award is appropriate. *See Fogerty*, 510 U.S. at 534 n.19 (The "nonexclusive factors that courts

should consider in making awards of attorney's fees . . . include . . . objective unreasonableness (both in the factual and in the legal components of the case)." (internal quotation marks and citation omitted)).

Turkish courts repeatedly implied prior to the Mother's removal of the children from Turkey in November 2011 that the children could live with their mother in the United States. In its order of May 13, 2011, for instance, the Third Family Court in Üsküdar rejected the Father's request for "provisionary parental custody" but granted him visitation rights to see the children every other weekend "if he goes to the USA." Joint App'x 589. On August 12, 2011, the same court granted the Father's request that the children return to Turkey *temporarily* to facilitate a personal relationship with their father. *Id.* at 596. And when the Father failed to return their passports so that the children could return to the United States, the court ordered that he return the passports. *Id.* at 602, 606. On March 30, 2012, the court again rejected a request by the Father for primary custody and ordered a continuation of his visitation schedule in the United States every other weekend. *Id.* at 618.

While these orders did not justify the Mother's removal of the children to the United States, they nonetheless suggest that her actions did not "run counter to the Convention's purpose of deterring child abductions by parents who attempt to find a friendlier forum for deciding custodial disputes." *Abbott*, 130 S. Ct. at 1996; *see also id.* at 1998 (Stevens, J., dissenting) ("The drafters' primary concern was to remedy abuses by noncustodial parents who attempt to circumvent adverse custody decrees (*e.g.*, those granting sole custodial rights to the other parent) by seeking a more favorable judgment in a second nation's family court system."). Quite the opposite; the Mother has consistently submitted to the jurisdiction of Turkish courts with respect to all divorce and child-custody matters, and she has followed the Turkish courts' orders.

**ii.**

In our view, an award of full expenses is unwarranted in light of the Mother's reasonable basis for thinking that she could remove the children from Turkey. In passing, however, we also note our concern that certain actions of the Father may reveal forum-shopping efforts that run contrary to the purpose of the Hague Convention, thus possibly increasing the difficulty and cost of resolving this dispute. In particular, after the children returned to Turkey in the summer of 2011, the Father filed a petition with the Turkish Ministry of Justice to bar the Mother from removing the children from Turkey. In its response, the Ministry explained that "the children have been brought to Turkey from the USA" and therefore "there is not any other procedure that may be carried out in accordance with the [Hague] Convention." Joint App'x 789 (letter of October 11, 2011). The Ministry specified that "an application may be made to the relevant Court by you . . . to take the necessary measures to prevent the residential address of the children [from] be[ing] change[d]." *Id.*

At that point, the Father should have applied to the Third Family Court for an order barring the Mother from taking the children out of the country without his permission. Yet, rather than filing a request with the Third Family Court to clarify and enforce his rights while the children were still in Turkey, the Father instead waited until the children had left Turkey to file a complaint in the Southern District of New York under the Hague Convention. This placed the onus on the American court to assess whether he retained custody rights under Turkish law—an issue that could have been much more easily handled by Turkish courts.[27] Moreover, upon receiving his desired

---

[27] The removal of a child from the country of habitual residence does not foreclose the possibility of resolving certain issues in that country's judicial system. For instance, the Hague Convention provides:

> The judicial or administrative authorities of a Contracting State may, prior to the making of an order for the return of the child, request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful within the meaning of Article 3 of the Convention, where such a decision or determination may be obtained in that State. The Central Authorities of the Contracting States shall so far as practicable assist applicants to obtain such a decision or determination.

relief under the Hague Convention from the District Court, the Father then successfully argued to the Turkish Court—contrary to the terms of the Hague Convention—that the American court's order precluded the return of the children to the United States,[28] when in fact the District Court's order did not resolve any custody matters between the parties. *See* 42 U.S.C. § 11601(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims.").[29]

We raise these forum-shopping concerns simply to note their potential relevance to the District Court's determination of an appropriate fees award. We leave for the District Court to decide in the first instance whether these concerns are justified—an issue that the District Court is in a better position to assess—and how these concerns, if justified, might affect an appropriate fees award.

### iii.

For the reasons stated above, we conclude that it would be clearly inappropriate to award all necessary expenses associated with the Father's action under the Hague Convention. Accordingly, we vacate the costs award and remand the cause to the District Court to determine in the first

Hague Convention, art. 15. Here, the Father obtained a letter from the Turkish Ministry of Justice—the Turkish Central Authority within the meaning of the Convention, *see* note 20, *ante*—explaining that the removal was wrongful. The District Court, however, properly considered the effect of that letter in light of the Mother's assertions that the Ministry of Justice was not aware of the various orders of the Third Family Court in Üsküdar purportedly granting (or at least endorsing) her custody of the children.

[28] *See* Appellee's Br. at ADD-61 ("[T]here was no decision submitted into our folder stating the stoppage of the execution of the decision of the US Court, and the court came to the conclusion, that if the children are taken to the US again this would be an act in violation of the decision of return."); Reply Br. at ADD-8 ("However, since there is no judgment presented to the case file for the suspension of the US court decision and in the event that the children are taken back to the USA the US court order will have been violated.").

[29] The Hague Convention prohibits the "the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained" from "decid[ing] on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention or unless an application under this Convention is not lodged within a reasonable time following receipt of the notice," Hague Convention, art. 16, but the Convention does not prevent a court with appropriate jurisdiction *in the country of habitual residence* from adjudicating custody matters during the pendency of an action under the Hague Convention. Accordingly, it would not have been inconsistent with the Hague Convention for a Turkish court to issue a temporary or permanent order permitting the Mother to return to (or remain in) the United States with the children, notwithstanding the ongoing judicial proceedings in the United States.

instance, using the standards articulated in this opinion, whether (and, if applicable, in what amount) to award costs.

## CONCLUSION

To summarize, we hold that:

(1)     The petitioner (the Father) has met his burden of showing that he retained custody rights under Turkish law, and that respondent (the Mother) removed the children from Turkey in interference with his exercise of those rights.  Accordingly, we affirm the District Court's return order.

(2)     Federal law creates a private right of action to enforce access rights protected under the Hague Convention.  *See* 42 U.S.C. § 11603(b).

(3)     When a district court considers awarding costs to a prevailing petitioner who obtains a return order under the Hague Convention, the court shall award "necessary expenses" relating to the action unless doing so would be "clearly inappropriate." 42 U.S.C. § 11607(b)(3).  This standard is discretionary in nature and is governed by general equitable principles.

(4)     In the circumstances of this case, an award of all necessary expenses would be "clearly inappropriate."

Accordingly, we **AFFIRM** the District Court's return order and **VACATE** its costs order. We **REMAND** the cause to the District Court to determine in the first instance an appropriate costs award consistent with the standards articulated in this opinion.  In the interest of judicial economy, this panel will retain jurisdiction over any subsequent appeal; either party may notify the Clerk of Court of a renewed appeal within fourteen days of the District Court's decision.  *See United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994).

33

In conclusion, we emphasize that we do not reach or decide the merits of any underlying custody issue. *See* 42 U.S.C. § 11601(b)(4); Hague Convention, art. 19. The Ozaltin children have now returned to Turkey, and Turkish courts are fully empowered to consider all relevant custody matters, including whether the children—who are American citizens—should be allowed under Turkish law to return to the United States with their mother.