[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-13918
Non-Argument Calendar
_____

D.C. Docket No. 1:18-cv-03446-RWS

MARCELLINUS PFEIFFER,

Petitioner-Appellant,

versus

RACHEL BACHOTET,

Respondent- Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(January 15, 2019)

Before TJOFLAT, WILLIAM PRYOR, and ROSENBAUM, Circuit Judges.

PER CURIAM:

This case arises under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, *also publ'd at* https://www.hcch.net/en/instruments/conventions/full-text/?cid=24 (last visited Dec. 18, 2018).  Plaintiff-Petitioner Marcellinus Pfeiffer, a German citizen, seeks the return of his children N.A.R. and R.H.E. from the United States to Switzerland.  His ex-wife, Respondent Rachel Bachotet, a French citizen who moved with the children from Switzerland to Georgia in June 2018, opposes the children's return.  Following briefing and two hearings, the district court denied Pfeiffer's petition.  After careful consideration, we now affirm the district court's decision for the reasons we explain below.

## I.

Pfeiffer and Bachotet were married in France in 2010.  Two years later, in 2012, they moved to Switzerland.  Pfeiffer and Bachotet have two children: N.A.R., a nine-year-old daughter, and R.H.E., an eight-year-old son.  Until June 17, 2018, both children had lived continuously in Switzerland since 2012.

In June 2017, Pfeiffer and Bachotet obtained a divorce when the District Court of Meilen, under the Canton of Zurich, Switzerland, issued a Sentence and Decree of Divorce (the "Divorce Judgment").  Among other provisions, this Divorce Judgment provided for the two children to "remain under shared custody of both parents."  It further "require[d] both parents' consent [to relocate the

children] if the new place of residence is located abroad or if relocation has some impact on the exercise of parental custody or visitation rights of either parent." Nonetheless, section 3.2.a) of the Divorce Judgment expressly specified that Pfeiffer "does not object to the mother's taking residence abroad (US or France) at/after[1] the end of the school term 2016/2017."

Other parts of the Divorce Judgment also indicated that it anticipated Bachotet would relocate with the children outside of Switzerland.  Paragraph 3.2.c)aa provided, "Until [Bachotet] relocates with the children abroad (see section [3.]2.a[)], last paragraph above), the children's father is entitled and obliged to exercise his obligation of care towards the children as follows . . . ."  Similarly, paragraph 3.2.c)bb stated, "As from relocation of [Bachotet] and the children abroad (see section [3.]2.a[)] last paragraph) the following visitation regime shall be effective . . . .  Once per year, [Bachotet] shall pay for travelling costs (round trip), when the children visit their father.  Any other visitation-related costs shall be borne by the father."

---

[1] Pfeiffer's translation of the Divorce Judgment—the original version of which was in German—uses the word "at," while Bachotet's translates the word as "after."  The original German version states, in relevant part, "Der Vater erklart sich damit einverstanden, dass die Mutter den Wohneitz der Kinder nach Ende des laufenden Schuljahres 2016/2017 ins Ausland veriegt (in die USA oder nach Frankreich)."  Pfeiffer's proposed translation does not indicate its source.  Bachotet's translation indicates that it is a "certified translation of a document in the German language" by Hazel Schauss, "[c]ertified and [s]worn Public Translator."  Nonetheless, our analysis does not depend on whether the correct translation is "at" or "after," so we do not choose between the two versions.

3

Until Bachotet relocated, however, the Divorce Judgment awarded Pfeiffer parenting time with the children every other weekend, with additional time for holidays and during the summer. In 2018, the guardian appointed to oversee the custodial arrangement between the parties modified the parents' custodial agreement so that Pfeiffer and Bachotet had equal time with the children. But while she entered a new parenting plan, under Swiss law, she lacked the authority to modify the Divorce Judgment. Therefore, the Divorce Judgment remained unchanged.

Meanwhile, according to Bachotet's counsel's undisputed proffer, on June 28, 2017, at the end of the children's 2016-17 school term, Bachotet began the relocation process by applying for a K-1 (fiancé) Visa for herself and K-2 Visas for the children to emigrate from Switzerland to the United States. Bachotet first received notice that the United States had authorized the Visas on May 17, 2018. Under the terms of the Visas, they were valid until July 6, 2018.

On June 9, a letter from Pfeiffer dated June 7 was delivered to Bachotet. In that letter, Pfeiffer wrote that he "revoke[d] [his] consent to [Bachotet's] relocation with [the] children . . . abroad, in the US or in France, as expressed in the [Divorce Judgment] in 2017." That same afternoon, Bachotet booked plane tickets for herself and her children to the United States for June 17, 2018.

4

On June 15, 2018, Pfeiffer sent a letter to the District Court of Meilen, which had jurisdiction over the Divorce Judgment.  In that letter, Pfeiffer stated that he "revoke[d] [his] consent to the relocation of [the] children . . . to the United States of America."  He requested that the court "immediately impose a travel ban . . . without consultation with . . . Bachotet, in order to keep her from leaving [Switzerland] with the children."  The record contains no subsequent order from the Swiss court acting on Pfeiffer's request.

On about June 17, 2018, Bachotet left Switzerland with the children for the United States.  The three currently reside in Marietta, Georgia, with Bachotet's American fiancé.

A month after Bachotet left Switzerland with the children, on July 17, 2018, Pfeiffer filed this litigation seeking return of the children to Switzerland under the Hague Convention.  The district court held a hearing on the merits of Pfeiffer's petition on August 24, 2018.  Following the hearing, on August 29, 2018, the district court issued an order denying Pfeiffer's petition.  The court reasoned that Pfeiffer had failed to satisfy his burden to show that Bachotet's removal of the children from Switzerland violated Pfeiffer's rights of custody, in light of the Divorce Judgment's provision awarding Bachotet "the exclusive right to determine whether the children would remain in Switzerland or move to the United States or France at the end of the 2016/2017 school year."  Doc. 31 at 7-8.

Pfeiffer now appeals.

## II.

Whether the Convention requires the return of the children to Switzerland or their continued residence in the United States presents a mixed question of law and fact.  *See Ruiz v. Tenorio*, 392 F.3d 1247, 1251 (11th Cir. 2004).  We review the district court's findings of fact for clear error and review *de novo* its legal determinations and application of the law to the facts.  *Id.*

This matter also raises questions of foreign law, in addition to issues of treaty interpretation and of construction of United States law.  Rule 44.1, Fed. R. Civ. P., governs our review of questions of foreign law.  *See* Fed. R. Civ. P. 44.1; *Ozaltin v. Ozaltin*, 708 F.3d 355, 368 (2d Cir. 2013).  Rule 44.1 provides,

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing.  In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law.

Fed. R. Civ. P. 44.1.  We follow the dictates of Rule 44.1.

## III.

Among other functions, the Hague Convention on the Civil Aspects of International Child Abduction "establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained."  22

6

U.S.C. § 9001(a)(4). The United States ratified the Convention, and Congress implemented it through the International Child Abduction Remedies Act ("ICARA"), *Lozano v. Montoya Alvarez*, 572 U.S. 1, 6 (2014), now codified at 22 U.S.C. §§ 9001 *et seq.* Notably, under the Convention and ICARA, courts are empowered "to determine only rights under the Convention and not the merits of any underlying child custody claims." *Baran v. Beaty*, 526 F.3d 1340, 1344 (11th Cir. 2008) (quoting 22 U.S.C. § 9001(b)(4)).

In particular, ICARA requires that "[c]hildren who are wrongfully removed . . . be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4). The removal or retention of a child in a state that is a signatory to the Convention is wrongful if

> a) it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised . . . or would have been exercised but for the removal or retention.

Convention art. 3. *See also Ruiz*, 392 F.3d at 1251.

The party seeking the child's return must establish by a preponderance of the evidence that the child was wrongfully removed or retained. *Calixto v. Lesmes*, No. 17-15364, ___ F.3d ___, 2018 WL 6257410, *2 (11th Cir. Nov. 30, 2018) (citing *Chafin v. Chafin*, 742 F.3d 934, 938 (11th Cir. 2013) and 22 U.S.C. §

7

9003(e)(1)(A)).  As relevant here, satisfying that burden requires the petitioner to show that (1) the child was a habitual resident of another country at the time she was removed to the United States; (2) the removal breached the petitioner's custody rights under the law of that other country; and (3) the petitioner was, in fact, exercising those custody rights when the child was removed.  *Id.* (citations omitted).

Here, as we explain below, Pfeiffer has established that the children's habitual residence at the time of removal was Switzerland.  But the district court nonetheless correctly denied Pfeiffer's petition because Pfeiffer has not demonstrated that Bachotet's removal of the children violated his custody rights under Swiss law.

## A.  *The children's habitual residence at the time of removal was Switzerland.*

We begin with the children's habitual residence on June 17, 2018, the day Bachotet removed them from Switzerland.  Neither the Hague Convention nor ICARA defines the term "habitual residency."  *Id*.  So we construe the term's "ordinary meaning as understood in the public law of nations."  *Santovincenzo v. Egan*, 284 U.S. 30, 40 (1931) (citation and internal quotation marks omitted).  The High Court of Justice in the United Kingdom has noted that a habitual residence is established when "the purpose of living where one does has a sufficient degree of continuity to be properly described as settled."  *In re Bates*, No. CA 122.89 at 9-

8

10, High Court of Justice, Fam. Div'n Ct. Royal Court of Justice, United Kingdom (1989).

In identifying when a child's habitual residence has been changed, we have offered further insight into the meaning of "habitual residency." We have set forth two requirements to alter a child's habitual residence: (1) the parents must share a "settled intention" to leave the old habitual residence behind; and (2) an "actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized" must occur. *Ruiz*, 392 F.3d at 1252-53. Both must be present to change a child's habitual residence.

We conclude, based on the second requirement, that the children's habitual residence had not changed as of the date of the challenged removal. Therefore, we need not consider the first requirement regarding the parents' shared intention. Here, as of the time of the challenged removal, June 17, 2018, the children—then seven and nine years old—had lived continuously in Switzerland for six years. Nothing in the record indicates that they had ever lived in—or even spent significant time in—the United States as of that date. Nor does the record suggest or do the parties argue that any other country could have served as the children's habitual residence as of June 17, 2018. And since acclimatization cannot take place without the parties' physical presence in a new country, the children's habitual residence as of the date of removal was Switzerland.

*B.   Bachotet's removal of the children from Switzerland did not violate Pfeiffer's custody rights under Swiss law.*

The Convention defines the terms "rights of custody" and "rights of access" as follows:

> Article 5:  For the purposes of this Convention—
>
> *a*:  "rights of custody" shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;
>
> *b*:  "rights of access" shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

Convention, art. 5.  Perhaps a simpler way of describing "rights of access" is as mere "visitation rights."  *See* 22 U.S.C. § 9002(7).  Rights of custody, on the other hand, are broader rights;  as we have noted above and as Article 5(a) states, those rights include "rights relating to the care of the person of the child *and, in particular, the right to determine the child's place of residence*."  Convention art. 5(a) (emphasis added).  In resolving this petition for return of the children, we must employ these definitions, as opposed to those of local law, common law, or any other source, since doing so "ensures international consistency in interpreting the Convention."  *Abbott v. Abbott*, 560 U.S. 1, 12 (2010).

We ascertain "the substance of parental rights" in any given case by consulting the law of the country "in which the child was habitually resident immediately before the removal[,] . . . or . . . a judicial or administrative decision,

10

or . . . an agreement having legal effect under the law of that [country]." *Ozaltin*, 708 F.3d at 367; Convention art. 3. But we evaluate whether those rights qualify as "rights of custody" under the Convention's definition of the term. *Ozaltin*, 708 F.3d at 367.

Since the Convention treats rights of custody and rights of access differently, it is important to distinguish between the two. *See id.* at 13. When a removal or retention violates a petitioner's rights of custody, the Convention authorizes the return of the child. *See* Convention art. 1. But it does not do so for a breach of rights of access. *Abbott*, 561 U.S. at 9. Rather, the Convention "requires contracting states 'to promote the peaceful enjoyment of access rights.'" *Id.* at 13 (quoting Convention art. 21).

With these considerations in mind, we explore the substance of parental rights under Swiss law. Article 133 of the Swiss Civil Code, Code Civil [CC] [Civil Code] Dec. 10, 1907, SR 210, RS 210, *as amended*, art. 133, endows courts with the authority to "regulate[] parental rights and obligations in accordance with the provisions on the legal effects of the parent-child relationship. . . . In particular it [has the power to] regulate[]: . . . residence . . . ." Under Swiss law, in cases like this one, where the parents enjoy joint parental responsibility, either the consent of the other parent or "a decision of the court or the child protection authority" is necessary before one parent may establish a new place of residence outside

11

Switzerland.  Swiss Civil Code, Art. 301a, Code Civil [CC] [Civil Code] Dec. 10, 1907, SR 210, RS 210, *as amended*, art. 301a.[2]

Here, the Divorce Judgment constituted a decision of the Swiss court.  And though Swiss law generally provides parents with a *ne exeat* right as it pertains to removal of a child from Switzerland,[3] *see* Swiss Civil Code, Art. 301a, the Divorce Judgment here expressly empowered Bachotet to relocate with the children to either the United States or France "at [or possibly after] the end of the school term 2016/2017."  Section 3.2.a); *see also* Section 3.2.c)aa ("*Until [Bachotet] relocates with the children abroad (see section [3.]2.a[)]* . . . the children's father is entitled and obliged to exercise his obligation of care towards the children as follows . . . .") (emphasis added); Section 3.2.c)bb ("As from *relocation of [Bachotet] and the children abroad (see section [3.]2.a[)]* . . . the following visitation regime shall be effective . . . .  Once per year, [Bachotet] shall pay for travelling costs (round trip), when the children visit their father.  Any other visitation-related costs shall be borne by the father.") (emphasis added).  So by Swiss law, under the Divorce Judgment, Bachotet had the sole rights of custody as they pertained to determining whether to move the children to the United States.

---

[2] English translations of these portions of the Swiss Civil Code are available at https://www.admin.ch/opc/en/classified-compilation/19070042/index.html.

[3] A *ne exeat* right is "the authority to consent before the other parent may take the child to another country."  *Abbott*, 560 U.S. at 5.

Pfeiffer does not contest this analysis, but he nonetheless asserts that events transpiring after the court entered the Divorce Judgment revoked Bachotet's authority to remove the children from Switzerland. In support of this claim, Pfeiffer urges three theories.

First, Pfeiffer argues that Bachotet's authority to remove the children was time-dependent and automatically expired when Bachotet failed to move them to the United States in June 2017. But even assuming that the Divorce Judgment is technically translated to mean "at the end of the 2016/2017 school term" rather than "after the end of the 2016/2017 school term," as Pfeiffer asserts, the record shows that Bachotet began taking steps immediately at the end of the 2016/2017 school term to move the children to the United States. It further indicates that Bachotet began the relocation process the same month that the children's 2016/2017 school term ended—June 2017. And it reflects that Bachotet did not receive notice that the children's visas for relocation to the United States had been approved until May 17, 2018. Bachotet then promptly obtained plane tickets and moved the children within a month of notification. Under these circumstances, we cannot conclude that Bachotet did not take steps to remove the children as soon as possible after the end of the 2016/2017 school term.

Second, Pfeiffer contends that, following the court's entry of the Divorce Judgment, he reestablished his rights of custody to determine the children's place

13

of residence.    Pfeiffer bases this claim on the modification to the custodial agreement that the guardian reached and the parents agreed to.  But Pfeiffer has not showed that the guardian's modification of the custodial agreement cognizably revoked the court's order authorizing Bachotet to remove the children to the United States at the end of the 2016/2017 school term.

Pfeiffer has not pointed to legal authority demonstrating that the guardian's amendment of the custodial agreement modified the Swiss Court's Divorce Judgment.    On the contrary, an August 21, 2018, letter from Pfeiffer's Swiss attorney, which Pfeiffer filed with the district court, indicates his attorney's view that, at the time that the guardian modified the custodial agreement, only the Swiss court had the authority to legally amend the Divorce Judgment in accordance with the changes to the custodial agreement.

Nor has Pfeiffer showed that the Swiss court ever amended the Divorce Judgment to incorporate or otherwise recognize the modified custodial agreement, even though under Swiss law, the Swiss court retained jurisdiction to amend its orders regarding custody.  In fact, Pfeiffer's June 15, 2018, letter to the Swiss court that issued the Divorce Judgment suggests that Pfeiffer was aware of this problem. In that letter, Pfeiffer requested amendment of the Divorce Judgment so that Bachotet no longer had the sole rights of custody to determine whether to move the children to the United States.  But Pfeiffer has not supplied the Court with any

14

indication that the Swiss court ever granted his request and modified the Divorce Judgment as he asked.  So the modified custodial agreement is not cognizable as "a decision of the court or the child protection authority."  Code Civil [CC] [Civil Code] Dec. 10, 1907, SR 210, RS 210, *as amended*, art. 301a.  And as a result, it does not rise to the level of a "judicial or administrative decision" under the Convention and cannot amend the Divorce Judgment, which governs the substantive parental rights here.

Finally, Pfeiffer argues that we should decide this case in line with the Third Circuit's decision in *Karkkainen v. Kovalchuk*, 445 F.3d 280 (3d Cir. 2006).[4]  But we find *Karkkainen* to be materially distinguishable.

There, the parents entered into a Stipulation in Custody that provided that the mother "shall have primary physical custody of [the child], including the right of the child's residence in Finland . . . ."  *Id.* at 285.  Though the Stipulation was signed by a common pleas judge, it was never actually filed with the court.  Thus, the Third Circuit described it as "an informal custody agreement . . . , not a binding court order."  *Id.* at 293.  The court also concluded that the parents' shared intention concerning where the child would live changed after the parties entered into the Stipulation but before the child was retained in the United States.  *Id.*  And

---

[4] Pfeiffer actually raises this argument under the intent aspect of the habitual-residence inquiry, not under the "rights of custody" analysis.  We did not reach the intent issue under the habitual-residence inquiry and as Pfeiffer has argued *Karkkainen*, he seems to suggest possible implications for the "rights of custody" analysis as well, so we evaluate it here.

15

since the parents' shared intention about the child's habitual residence must be ascertained as of the time of removal or retention, the court concluded, the Stipulation "was no longer binding." *Id.* Pfeiffer contends that *Karkkainen* demonstrates that "an agreement by parents to allow for the relocation of the children can be amended informally by their actions."

The problem for Pfeiffer, though, is that *Karkkainen* concerns divining the parents' shared intent for the child's habitual residence—an issue of fact. But the inquiry into who possesses the right to determine the child's place of residence is a question of law—or, at the very least, a mixed question of fact and law. And a parent's formal expression of a change in her or his desire about a child's place of residence cannot, in and of itself, legally somehow modify a court order. For this reason, on this record, we do not find *Karkkainen* instructive on the question of ascertaining which parent or parents enjoy the right to determine the child's place of residence.

In short, under the Divorce Agreement, Pfeiffer does not enjoy a *ne exeat* right as it pertains to Bachotet's authority to move the children from Switzerland to the United States. And since the Divorce Agreement is a court order that has not been modified, it constitutes Swiss law for purposes of ascertaining the parties' rights of custody to determine the children's place of residence. We are therefore bound to apply its terms and affirm the district court's conclusion that Pfeiffer has

16

not satisfied his burden to establish a prima facie case of wrongful removal under the Hague Convention.

## III.

For the foregoing reasons, we affirm the judgment of the district court denying Pfeiffer's petition for return of the children to Switzerland under the Hague Convention.

**AFFIRMED.**