[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10982
Non-Argument Calendar
_____

D.C. Docket No. 6:19-cv-00251-CEM-KRS

ROBERTO GRAU,

Plaintiff - Appellant,

versus

HELEN GRAU,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 12, 2019)

Before WILSON, NEWSOM, and BRANCH, Circuit Judges.

PER CURIAM:

Petitioner Roberto Grau seeks the return of his four-year-old twin sons to

Germany from Florida, where they are living with his wife, Helen Grau. After an

expeditious bench trial at which both parents testified, the district court denied Roberto's petition on the grounds that the twins' country of habitual residence is the United States. For the reasons that follow, we affirm the judgment of the district court.

I

The undisputed evidence is as follows. Roberto and Helen, citizens of Germany, were married there in 2012. Their twin sons, also German citizens, were born in Germany in 2014. Soon after, Roberto accepted a temporary work assignment in Massachusetts, and the entire family moved to the United States in May 2015 on L-1 and L-2 visas.[1]

Apart from a three-month trip to Germany in late 2015 to visit family and attend to U.S. immigration issues, the Graus lived together in the United States until November 2016. At that point, Roberto's work assignment ended and the family returned to Germany. Helen and the children then vacationed in Spain for three or four weeks. In February 2017, Roberto received another work assignment in Massachusetts and the family returned to the United States, again on L visas.

---

[1] Nonimmigrant L visas for "intracompany transferees" may be issued upon an employer's petition, based on the employee's executive or managerial capacity or specialized knowledge, to an employee and his spouse and children in order to work for the employer in the United States temporarily. *See generally* 8 U.S.C. § 1101(a)(15)(L); 8 C.F.R. § 214.2(*l*). The visa is valid only for the period of the employer's need, which may be up to three, five, or seven years. 8 C.F.R. § 214.2(*l*)(7)(i)(A)(2), (*l*)(15)(ii).

When that work assignment ended in March 2018, the Graus decided to continue pursuing their "dream" of living in the United States long-term. They agreed that Helen and the twins would move to Florida—where they had some close friends—and start a cleaning business, in support of an application for an E-2 investor visa.[2] Roberto, meanwhile, would return to Germany and work to support the family and the fledgling business. He planned to join them in the United States if his career in Germany did not work out.

In July 2018, Helen and the twins returned to Germany for her consular interview. By this point the Graus had invested about $100,000 in Helen's business. The family lived together at a friend's house for six weeks while they waited to hear if the visa would be approved. When it was, Roberto signed an open-ended travel consent form, and Helen and the twins returned to Florida in August 2018. The children attended school, participated in activities, and made friends in Florida.

In October 2018, Helen filed for divorce and informed Roberto via telephone and email. She moved the children to an undisclosed address, and

---

[2] Nonimmigrant E-2 visas for "treaty investors" may be issued to an alien and his spouse and children "solely to develop and direct the operations of an enterprise in which he has invested, or of an enterprise in which he is actively in the process of investing, a substantial amount of capital." 8 U.S.C. § 1101(a)(15)(E)(ii); *see generally* 8 C.F.R. § 214.2(e). The investor must intend to depart the United States upon the expiration of his treaty investor status. 8 C.F.R. § 214.2(e)(5). The initial admission is for not more than two years, with an unspecified number of two-year extensions possibly available. *Id.* § 214.2(e)(19), (e)(20).

Roberto began child custody proceedings in Germany. In February 2019, Roberto filed the instant petition for the return of the children to Germany.

## II

The district court conducted a bench trial in which it heard two very different versions of the Graus' intentions for their family. Both Roberto and Helen testified that it was always their dream to live and raise their family in the United States. But their stories and lives diverged at some point in 2018.

Roberto testified that, during Helen's visit to Germany in July 2018, they agreed that she and the twins would be staying in Germany. He said they decided that the timing was not right for them to live in the United States, with the children so young, the cost of living so high, and him about to start a new job in Germany. He said she agreed to return to Germany, and he gave his consent for the children to travel to Florida just so that Helen could wind down the cleaning business. He testified that Helen said she would return to Germany with the children in December 2018.

Roberto also testified that he was blindsided by the divorce. He insisted that he never would have given his consent for the children to return to Florida if he had known Helen was going to divorce him. He also was surprised to learn that his name was not on the E-2 visa application; he said Helen told him it would be, and he would not have invested $100,000 toward not getting a visa himself.

4

Helen asserted that "it was always the dream for us to live in the United States because we both agreed it would be best for the boys." But she testified that she had thought about divorcing Roberto often over the years, in light of his violent and domineering behavior toward her throughout and even before their marriage.[3] She first met with a divorce attorney in April 2018, around the time she applied for the E-2 visa.

Helen denied that Roberto had asked her to stay in Germany. She asserted that it would not make sense for him to suggest that she stay, since he had invested so much money for her to obtain a long-term visa. If he had decided during her July 2018 visit that she should stay, she would not have needed to continue pursuing the E-2 visa; she could have returned to Florida to close the business under the Visa Waiver Program. Helen further asserted that it was not significant that Roberto's name was not on the E-2 visa application, since he could always be added later as a dependent spouse.

The district court weighed this testimony before denying Roberto's petition for the return of the children. It found that the children's habitual place of residence was, since 2015, the United States, and that their habitual residence was not changed back to Germany in July 2018. In addition to crediting Helen's

_____

[3] The district court opined that the evidence of domestic violence was inconclusive.

5

testimony about her continuing intent to build a life in Florida, the court also noted that the children still live there and do not have a permanent residence in Germany.

Roberto appealed to this Court. We granted his request to stay the appeal while he pursued postjudgment relief in the district court. *See* Fed. R. Civ. P. 60(b), 62.1. The district court denied that relief , but rather than appeal this denial, Roberto has moved our Court to enlarge the record to include the district court's denial order and to allow him to supplement his briefing with arguments about that order. We lifted our stay on June 12, 2019, and now proceed to consider this appeal.

## III

We begin with Roberto's pending motions. To be sure, we have inherent equitable power to supplement our appellate record with information the district court did not consider, and we have exercised it when the interest of judgment so demanded. *See, e.g.*, *Ross v. Kemp*, 785 F.2d 1467, 1474–75 (11th Cir. 1986).

But we decline to add the district court's order denying postjudgment relief to our review of its denial of Roberto's petition. Roberto asserts that our consideration of that denial would be "beneficial," but he does not explain why or otherwise argue that the interest of justice supports our doing so. Of course, Roberto easily could have brought this material into our purview by appealing the denial of his Rule 60(b) motion. He has not done so. We therefore see no reason to

6

incorporate the district court's order into the record, or to entertain arguments based upon that order, while we lack jurisdiction to review it. *See Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1528 (11th Cir. 1987) ("[A]n appellate court has jurisdiction to review only those judgments, orders or portions thereof which are specified in an appellant's notice of appeal.").

Roberto's motions to supplement the record and his briefing are **DENIED.**

## IV

Roberto's original petition was filed under the Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670 ("Hague Convention"), and its U.S. implementing statute, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–9011 (formerly 42 U.S.C. §§ 11601–11610). The Hague Convention's objective is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State." Hague Convention, art. 1. Thus, the goal of a proceeding under the Hague Convention is the prompt return of the child, not the resolution of any underlying child custody claims. 22 U.S.C. § 9001(a)(4), (b)(4). Return proceedings are to be administered "expeditiously." Hague Convention, art. 11.

Under ICARA, a petitioner must establish, by a preponderance of the evidence, that the child in question "has been wrongfully removed or retained within the meaning of the Convention." *Id.* § 9003(e)(1)(A). Here, to establish

7

wrongful retention, Roberto must show that the children were "habitually resident" in Germany before Helen retained them in the United States; that the retention breached Roberto's custody rights under German law; and that he had been exercising those rights at the time of retention. *See* Hague Convention, art. 3; *Palencia v. Perez*, 921 F.3d 1333, 1338 (11th Cir. 2019).

Habitual residence is not defined in the Hague Convention. *Ruiz v. Tenorio*, 392 F.3d 1247, 1252 (11th Cir. 2004). Undefined words in treaties "are to be taken in their ordinary meaning, as understood in the public law of nations." *De Geofroy v. Riggs*, 133 U.S. 258, 271 (1890). Explaining that ordinary meaning, our Circuit has approved a British definition of habitual residence that looks simply to settledness in a place, not permanence. "[A] habitual residence is established when 'the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.'" *Pfeiffer v. Bachotet*, 913 F.3d 1018, 1023–24 (11th Cir. 2019) (quoting *In re Bates* [1989] 2 WLUK 293 (Fam.), 1989 WL 1683783). Furthermore, to alter a child's habitual residence, "the parents must share a 'settled intention' to leave the old habitual residence behind," and "an 'actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized' must occur." *Id.* at 1024 (quoting *Ruiz*, 392 F.3d at 1252–53).

8

Determining the habitual residence of a child is a mixed question of law and fact.[4] *Ruiz*, 392 F.3d at 1251. The subsidiary question of "[w]hether there is a settled intention to abandon a prior habitual residence is a question of fact as to which we defer to the district court." *Id.* at 1252–53. We will review that and other factual findings of the district court only for clear error; we review its legal conclusions, as well as its applications of the law to the facts, de novo. *Id.* at 1251–52. Thus, we "accept the district court's historical or narrative facts unless they are clearly erroneous, but exercise plenary review of the court's choice and interpretation of legal precepts and its application of those precepts to the facts." *Id.* at 1251 (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 222 (3d Cir. 1995)).

**V**

---

[4] We acknowledge that the U.S. Supreme Court has recently granted certiorari in an appeal presenting the question of the proper standard of review of a district court's determination of habitual residence under the Hague Convention. *See Taglieri v. Monasky*, 907 F.3d 404 (6th Cir. 2018) (en banc), *cert. granted*, 87 U.S.L.W. 3476 (U.S. June 10, 2019) (No. 18-935). Our Circuit already affords less deference to district courts on this issue than did the en banc Sixth Circuit. *Compare id.* at 409 ("the determination of habitual residence is a question of fact subject to clear-error review") *with Ruiz*, 392 F.3d at 1251. Thus, even if the Supreme Court were to reverse the judgment of the Sixth Circuit and adopt a less deferential standard of review, the result required in this case would be no different. The result here would also be the same if the Supreme Court were to apply a less deferential review to the related factual question of the parents' intentions. The intent findings here and in our precedents are closely tied to the district court's credibility determinations, made after hearing the parents' testimony and observing their demeanor. No matter how the Supreme Court decides *Monasky*, it will remain common ground that district courts' credibility determinations are entitled to deference. "Rule 52(a) [of the Federal Rules of Civil Procedure] admonishes due regard for the trial court's opportunity to assess the credibility of witnesses." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 122 n.18 (1969).

The sole question before us on appeal is whether the Graus' children were habitual residents of Germany in October 2018, when Helen filed for divorce and retained the children in Florida.[5] If not, Roberto's petition for return of the children to Germany is due to be denied.

The district court first found that "it is clear that the Children's habitual place of residence was the United States" since their move here as infants in 2015 and until July 2018. Roberto argues that the family's 2015 move to the United States, which involved nonimmigrant visas and a finite work assignment, was never intended to be permanent. But, for the purposes of this appeal, it is unnecessary to us to assess the children's habitual residence before 2018.

We decide only that, as of March 2018, the children were habitually resident in the United States. By that time, Helen and the children—with Roberto's full assent—had moved to Florida, started a business, and applied for long-term E-2 investor visas that would allow them to remain in the United States without being subject to the timetables of Roberto's employer. Both Roberto and Helen in their testimony affirmed this plan as realizing their mutual "dream" of raising the twins in the United States. This arrangement reflects a settled purpose for the children to

---

[5] The district court did not reach the other two elements of a prima facie case of wrongful removal or retention: that Roberto has custody rights in Germany and that he has attempted to exercise them. *See* Hague Convention, art. 3. Because we decide this appeal based only on the habitual-residence element of the prima facie case of wrongful retention, we do not reach the other elements of the prima facie case or the question of the retaining parent's defenses under the Convention and ICARA. *See* Hague Convention, arts. 12, 13, 20; 22 U.S.C. § 9003(e)(2).

10

live in the United States. And the children's lives in Florida from this point bear indicia of continuity and settledness, including the Graus' investment of $100,000 in Helen's business, signing a long-term apartment lease, and enrolling the children in school and extracurricular activities. Moreover, the children were removed from the German government's residency registration system in 2016 and were never reregistered. We thus agree with the district court that the children were purposefully "settled" in the United States in March 2018. *See Pfeiffer*, 913 F.3d at 1023–24.

Thus, the next issue presented is whether the children's habitual residence changed to Germany before Helen retained them in the United States in October 2018. In order for a child's habitual residence to change, the parents must share an intent to abandon the previous residence. *Ruiz*, 392 F.3d at 1252 (citing *Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001)). "The 'unilateral intent of a single parent' will not suffice to change a child's habitual residence." *Calixto v. Lesmes*, 909 F.3d 1079, 1084 (11th Cir. 2018) (quoting *Redmond v. Redmond*, 724 F.3d 729, 745 (7th Cir. 2013)). In the absence of a shared intent to change a child's habitual residence, we may find a change in habitual residence "if the objective facts point unequivocally to a new habitual residence." *Id.* at 1084–85 (quoting *Ruiz*, 392 F.3d at 1254).

11

Helen brought the children to Germany in July 2018, but the question is whether she and Roberto shared an intent that the children abandon their habitual residence in the United States at that time or thereafter. As we have noted, the record evidence about Roberto and Helen's intentions for the children in July 2018 is mixed. Roberto testified that he and Helen agreed that she would return with the children to Germany after winding down her business in Florida. Helen, by contrast, testified that Roberto never asked her to stay in Germany, and that she never wavered from the dream she had shared with him to raise the twins in the United States. The district court credited Helen's testimony on this point, finding that she "never intended for her or the Children to move back to Germany."  It noted that her testimony was corroborated by the evidence of her continued investment in her business and the family's life in Florida, explaining that she would not have needed to continue pursuing an E-2 visa if she was planning to close the business.

On this central disputed fact of whether Roberto and Helen shared an intent in July 2018 that the children would return to Germany and thus abandon their habitual residence in the United States, the district court is entitled to our deference. We will not disturb its credibility determination or factual findings in favor of Helen. *See Furnes v. Reeves*, 362 F.3d 702, 724 n.21 (11th Cir. 2004), *overruled on other grounds by Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014). In

12

the absence of compelling evidence to the contrary, we do not find clearly erroneous the district court's finding of historical fact, based on its credibility assessments, that there was no shared intent to change the twins' habitual residence to Germany.

Roberto's argument on appeal takes issue not with that finding, but rather with the district court's failure to find that the Graus' shared intent to make the United States the children's place of habitual residence was conditional. He admits, consistent with his testimony in the district court, that he and Helen always wanted to raise their children in the United States. But he argues that "his consent to the children living in the United States . . . was always conditioned on the family staying together as one unit." In other words, although the record is factually clear about the Graus' "dream" to have their children grow up in the United States, Roberto asks us to conclude that this shared intent of habitual residence in the United States was conditional and that it was voided when Helen filed for divorce, terminating the condition of family togetherness.[6] Thus, he argues, the children's place of habitual residence was always Germany.

---

[6] Of course, the Grau family was not physically together as one unit for most of 2018, even before Helen filed for divorce. As the district court noted, Roberto's testimony about his own residential intentions was somewhat contradictory. He testified both that he intended to join Helen and the children in Florida and that he regarded moving to Florida as his back-up plan if his own career in Germany did not work out.

Roberto points to ICARA cases in which we have said that the parents'
conditional relocation will not change a child's country of habitual residence if the
condition is not realized. *See Calixto*, 909 F.3d at 1089–91 ("the intent to change
the habitual residence of a child from one country to another can be conditioned on
the ability of one parent to be able to live in the new country with the child"); *Ruiz*,
392 F.3d at 1254–56. In these cases, as well as in those from our sister circuits, the
Court has looked closely into the record to determine whether there was a real
shared intent to change the child's habitual residence, or else merely a conditional
one. That determination in these cases has hinged mainly upon the credibility of
the parents' testimony in the district court, and, to a lesser extent, upon the related
objective evidence about the family's housing, work, and travel arrangements.

Thus, the district court's credibility determinations have been central to any
finding that shared intent to change a child's habitual residence was conditional. In
*Calixto*, for example, we remanded for further factfinding on the shared-intent
dispute generated by contradictory testimony about the parents' relationship and
the one-year return date on the child's travel consent form. 909 F.3d at 1092. And
in *Ruiz*, we accepted the district court's credibility determinations about
objectively corroborated testimony that the child's move to Mexico was intended
as a trial period. 392 F.3d at 1254. *See also Hofmann v. Sender*, 716 F.3d 282, 287,
292 (2d Cir. 2013) (conditional intent based on both parents' testimony and

14

evidence of residential, employment, and religious ties); *Mota v. Castillo*, 692 F.3d 108, 114–15 (2d Cir. 2012) (conditional intent based on mother's credible testimony); *Maxwell v. Maxwell*, 588 F.3d 245, 253 (4th Cir. 2009) (conditional intent based on tourist visas and round-trip tickets); *Papakosmas v. Papakosmas*, 483 F.3d 617, 626 (9th Cir. 2007) (conditional intent based on parents' employment and housing arrangements); *Gitter v. Gitter*, 396 F.3d 124, 135 (2d Cir. 2005) (conditional intent based on mother's credible testimony).

Here, the district court's credibility determinations precluded a finding that the Graus' shared intent to make the United States the children's place of habitual residence was conditional. The district court apparently did not find credible Roberto's testimony that Helen had agreed to return with the children to Germany because they mutually decided that the timing was not right for them to live in the United States. Instead, as we have noted, the district court credited Helen's testimony about the Graus' shared intent when it found that Helen "never intended for her or the Children to move back to Germany." Moreover, Roberto's written consent for the children to return to the United States in August 2018 bore no return date or condition. He asserts that Helen obtained that consent by deceit and subterfuge, but the district court made no such finding. The court did not decide whether Helen lied to Roberto that she intended to return to Germany, and the disputed evidence on that question does not compel us to conclude that she

15

deceived Roberto. Thus, with deference to the district court's credibility assessments, we find error neither in its rejection of Roberto's conditional-intent theory about the Graus' move to the United States, nor in its finding of historical fact that the Graus did not share an intent later in 2018 to make Germany the twins' new place of habitual residence.

Because we conclude that the district court did not clearly err with respect to its shared-intent findings, we need not reach the other two elements required to change a child's habitual residence: actual change in geography and adequate time for acclimatization. *See Pfeiffer*, 913 F.3d at 1024. Nonetheless, we note that both of those elements also support the district court's findings about the Graus' shared intent. With respect to their shared intent by March 2018 to make the United States the children's habitual residence, the children were actually living in the United States, and they had had time for acclimatization, having lived here for nearly three years (minus two one- to two-month visits to Germany and Spain). With respect to the Graus' lack of shared intent to make Germany the children's habitual residence by October 2018, the children were not actually living in Germany at that time, and "acclimatization cannot take place without the parties' physical presence in a new country." *Id.*

We also find in the alternative that even if the evidence of shared intent were ambiguous or non-dispositive, the undisputed objective facts here also fail to

16

establish unequivocally that the twins' habitual residence has changed to Germany. *See Ruiz*, 392 F.3d at 1255. The twins live in the United States. They attend school, participate in sports and activities, and have friends here. Although they also have some family in Germany, they do not have a residence there; they stayed at the home of friends rather than in Roberto's apartment during their last visit. The objective facts overall do not point unequivocally to a new habitual residence in Germany.

## VI

The denial of Roberto's petition for return of the children is **AFFIRMED**, and all pending motions are **DENIED.**